**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| Busey Bank, an Illinois Banking Corporation, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Michael G. Turney, David Besler, Milissa Ommen-Welborn, Randall Clark Barbara Weidner, Kirk Tjernagel, Ron Briscoe, Sandra Vick, Keith Frank Mouis, Joseph Riley Mongiovi, Nicholas W. Villareal, Bradley David Gish, Keri Kikta, Jeffrey Hopper, Deborah Stoch, and Flagstar Bank, FSB, | ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## **COMPLAINT**

Plaintiff Busey Bank, an Illinois Banking Corporation (hereinafter "Busey Bank" or "Plaintiff"), by and through its undersigned counsel, brings this Complaint against Defendants Michael G. Turney ("Turney"), David Besler ("Besler"), Milissa Ommen-Welborn ("Ommen-Welborn"), Randall Clark ("Clark"), Barbara Weidner ("Weidner"), Kirk Tjernagel ("Tjernagel"), Ron Briscoe ("Briscoe"), Sandra Vick ("Vick"), Keith Frank Mouis ("Mouis"), Joseph Riley Mongiovi ("Mongiovi"), Nicholas W. Villareal ("Villareal"), Bradley David Gish ("Gish"), Keri Kikta ("Kikta"), Jeffrey Hopper ("Hopper"), and Deborah Stoch ("Stoch"). (collectively "Former Employee Defendants") and their new employer, Flagstar Bank, FSB ("Flagstar") (Collectively with the Former Employee Defendants, the "Defendants"). This action

1

results from Flagstar's improper scheme to build and expand its business by raiding Busey Bank's employees and misusing the proprietary and trade secret information they possess, all in violation of law, rather than through fair competition, and the coordinated resignations of the Former Employee Defendants from Busey Bank, before, during, and after which the Former Employee Defendants demonstrated their absolute intention to ignore their respective protective agreements in order to join Flagstar, one of Busey Bank's competitors, and compete with Busey Bank in the mortgage loan origination industry, inevitably using and disclosing Busey Bank's trade secrets to Flagstar's benefit. Busey Bank brings this Complaint against the Former Employee Defendants for, *inter alia*: (I) misappropriation and inevitable disclosure of Busey Bank's trade secrets in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 et seq (the "DTSA"); (II) breaches of contract, including non-solicitation and confidentiality covenants; and (III) breaches of fiduciary duties, and (IV) intentional tortious interference with Busey Bank's business relationships and its contracts; and against Flagstar for, *inter alia*: (I) threatened misappropriation of Busey Bank's Trade Secrets under the DTSA, (II) unfair competition, (III) intentional tortious interference with Busey Bank's business relationships and its contracts with the Former Employee Defendants, and (IV) the inducement the Former Employee Defendants to breach their fiduciary duties to Busey Bank. Busey Bank thereby seeks temporary and preliminary injunctive relief, monetary damages, and the recovery of its attorney's fees and costs. In support thereof, Busey Bank alleges as follows:

## I.    NATURE OF THE ACTION

1.    This case involves egregious and intentional violations by employees of their obligations to their employer for the benefit of themselves and their new employer.

2.     Busey Bank is an Illinois-based bank that engages, on its own behalf and on behalf of its customers, in various banking and wealth management services through which it provides, *inter alia*, all manner of banking and mortgage loan origination and refinancing services and other related financial products along with asset management, investment, and fiduciary services to individuals, businesses, and foundations. Busey Bank's provision of these products and services is made possible through its generation, maintenance, and protection of confidential information, including but not limited to, market studies and strategies, financial studies and data, sales programs and price strategies, mathematical models, computer programs, statistical methods and algorithms, and the personal confidential information of customers who Busey Bank generates via targeted marketing efforts and community goodwill (collectively, "The Busey Bank Trade Secrets").

3.     Busey Bank has substantial time, effort, and resources in developing its customer base and networks, workforce, and confidential and proprietary technology and information and The Busey Bank Trade Secrets. Busey Bank invests millions of dollars researching and developing The Busey Bank Trade Secrets for its business - information that provides Busey Bank with a competitive advantage in the market and generates substantial profits annually for Busey Bank. Busey Bank takes appropriate steps to maintain the secrecy of the The Busey Bank Trade Secrets including, among other things, requiring employees involved in developing and using the The Busey Bank Trade Secrets to sign confidentiality and non-solicitation agreements.

4.     The Former Employee Defendants, through the course of their Busey Bank employment, became privy to The Busey Bank Trade Secrets, and possess proprietary information about, and had direct contact with, Busey Bank's customers, carriers, vendors, suppliers, employees, and independent contractors.

3

5.      In the second half of 2020, Flagstar and the Former Employee Defendants, along with several other former Busey Bank employees, worked together to coordinate the staggered and mass-resignation of twenty-one Busey Bank employees across six offices in two states, Illinois and Indiana. The individuals not named in the caption of this action are: Christa A. Smith, Casey Joanne-Elaine Wilson, Kimberly Ann Sannella, Kyle R. Bernfield, Mark Thomas Dietrich, and Kellie Marie LaMonaca (collectively, the "Related Individuals").

6.      The Former Employee Defendants and the Related Individuals worked in the following offices: the North Veterans Bloomington office, the Yorkville Mortgage office, the Downtown Naperville office, the Plainfield office, and the Homer Glen office, all of which are situated within Illinois, and the Carmel Mortgage Suite in Indiana. Following the mass-resignations of these individuals, the offices named herein were left with no Busey Bank employees, thus destroying their economic viability. Due to this economic decimation, Busey Bank had to incur vast costs associated with recruiting, screening, hiring, and training employees and re-staffing those offices.

7.      Prior to these resignations, Flagstar worked primarily with Turney, who while still employed by Busey Bank solicited the Former Employee Defendants and Related Individuals both in conjunction with Flagstar and on Flagstar's behalf.

8.      By hiring en-masse the Former Employee Defendants and the Related Individuals identified in Paragraph 5 herein, Flagstar has engaged in an improper effort to develop its own business by misappropriating the customer goodwill, relationships, and knowledge of confidential and proprietary information the Former Employee Defendants and other Related Individuals acquired through their employment with Busey Bank

9.      Flagstar's brazen and systematic poaching of Busey Bank's former employees constitutes tortious interference with Busey Bank's contractual relations with its former employees, the

4

misappropriation of The Busey Bank Trade Secrets, and unfair competition. Furthermore, each Former Employee Defendant, particularly Turney, induced and conspired with Flagstar and other of the Former Employee Defendants and Related Individuals to breach their duties of loyalty and/or post-employment obligations to Busey Bank and to misappropriate The Busey Bank Trade Secrets.

10.     If Defendants' misconduct, including without limitation contractual breaches, tortious interference, the actual or threatened misappropriation of The Busey Bank Trade Secrets, and unfair competition, is permitted to continue, all for the benefit of Flagstar and to the detriment of Busey Bank, Flagstar – now a direct Busey Bank competitor – will succeed in improperly appropriating Busey Bank's goodwill and competing unfairly and without investment of the significant time and money that Busey Bank has made in developing its customer and carrier relationships, its skilled and stable workforce, and its business strategies.

11.     Irreparable harm has resulted and will continue to result to Busey Bank from Flagstar's systematic raiding of Busey Bank's employees as well as from the Former Employee Defendants' continuous violations of their respective agreements with Busey Bank. As such, Busey Bank requires injunctive relief to protect itself from such grave commercial misconduct.

12.     Busey Bank also seeks all damages resulting from Defendants' past, current, and continuing misconduct.

## II.     PARTIES AND RELATED INDIVIDUALS

13.     Plaintiff Busey Bank is an Illinois banking corporation with its headquarters and principal place of business in Champaign, Illinois. At all times relevant hereto, Busey Bank operated and maintained an office located at 13901 S. Bell Road Homer Glen, IL 60491 (the "Homer Glen Office").

14.     Defendant Flagstar is a Michigan corporation with its headquarters and principal place of business in Troy, Michigan, and offices in Illinois, Indiana, Michigan, Wisconsin, and Ohio. Flagstar provides similar services to Busey Bank and therefore competes with it.

15.     Upon information and belief, each of the Former Employee Defendants both reside and work in the state of Illinois.

16.     Prior to becoming employed with Flagstar, each of the Former Employee Defendants was employed by Busey Bank in Illinois.

17.     Turney was employed by Busey Bank from November 9, 2016 until August 25, 2020

18.     Besler was employed by Busey Bank from August 1, 2005 until October 23, 2020.

19.     Ommen-Welborn was employed by Busey Bank from January 2, 2019 until October 23, 2020.

20.     Clark was employed by Busey Bank from January 11, 1999 until October 23, 2020.

21.     Weidner was employed by Busey Bank from August 19, 2019 until July 24, 2020.

22.     Tjernagel was employed by Busey Bank from February 15, 2017 until August 28, 2020.

23.     Briscoe was employed by Busey Bank from January 12, 2009 until October 23, 2020.

24.     Vick was employed by Busey Bank from December 18, 2017 until October 23, 2020.

25.     Mouis was employed by Busey Bank from November 5, 2016 until September 4, 2020.

26.     Mongiovi was employed by Busey Bank from November 5, 2016 until August 28, 2020.

27.     Villareal was employed by Busey Bank from November 5, 2016 until July 24, 2020.

28.     Gish was employed by Busey Bank from August 19, 2019 until September 1, 2020.

29.     Kikta was employed by Busey Bank from November 9, 2015 until August 29, 2020.

30.     Hopper was employed by Busey Bank from July 22, 2019 until August 22, 2020.

31.     Stoch was employed by Busey Bank from August 3, 2015 until August 29, 2020.

32.     The Related Individuals' employments with Busey Bank ended as follows: Christa A. Smith (August 28, 2020), Casey Joanne-Elaine Wilson (August 7, 2020), Kimberly Ann Sannella (July 24, 2020), Kyle R. Bernfield (August 28, 2020), Mark Thomas Dietrich (September 28, 2020), and Kellie Marie LaMonaca (September 4, 2020).

33.     Currently, each of the Former Employee Defendants is employed by Flagstar in Illinois, and the Related Individuals are employed by Flagstar in Indiana.

### III.     JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction over this action. Busey Bank's claims in this action raise a federal question under both the DTSA[1] and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*. The Court has supplemental jurisdiction over Busey Bank's other claims pursuant to 28 U.S.C. § 1367.

35.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because this is a judicial district in which at least one of Defendants resides, and the remaining Former Employee Defendants are domiciled in Illinois. Venue is also proper in this judicial district under 28 U.S.C. § 1391(b)(1) because Flagstar does business in the district.

36.     Venue also is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the events or omissions giving rise to Busey Bank's claims has occurred.

37.     This Court has subject matter jurisdiction over the claims asserted by Busey Bank against Defendants.

---

[1] Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 et seq.

## IV.     PRELIMINARY STATEMENT

38.     Flagstar collaborated and conspired with Former Employee Defendants, namely Turney, in a concerted effort to coordinate a staggered, mass-resignation of numerous Busey Bank employees, thereby decimating Busey Bank's mortgage loan originator work force across six offices in two states.  Flagstar, which had no mortgage presence in Illinois prior to its mass solicitation and poaching of the former Busey Bank employees, worked primarily with Turney to engage in this improper effort to develop its own business by misappropriating the customer goodwill, relationships, and knowledge of confidential and proprietary information the Former Employee Defendants and other Related Individuals acquired through their employment with Busey Bank.

39.     Flagstar coordinated with Turney to solicit the other Busey Bank employees while Turney was still employed by Busey Bank as Senior Vice President - Mortgage Sales Division. Prior to resigning his employment with Busey Bank, Turney worked with Flagstar to actively solicit over twenty other Busey Bank employees to leave Busey Bank and join Flagstar, thereby breaching his fiduciary duties to his employer. Many of the Busey Bank employees Turney and Flagstar solicited were individuals over whom Turney had direct supervision in his role as Senior Vice President – Mortgage Sales Division. With Flagstar's assistance, Turney abused his senior role and authority over these employees by fraudulently misrepresenting material facts regarding Busey Bank in an attempt to fraudulently induce those same individuals to resign from Busey Bank and join Flagstar, a direct competitor.

40.     Turney has already begun employment with Flagstar, and both before and after his resignation from Busey Bank, Turney, along with Flagstar working in concert with him,

wrongfully solicited—and continues to wrongfully solicit—Busey Bank employees and customers.

41.    Further, upon information and belief, Turney also absconded with numerous forms of documentation and information containing Busey Bank confidential and trade secret information related to its employees and clients that Turney would not have known or had access to but for his employment and Senior Vice President – Mortgage Sales Division role at Busey Bank. The circumstances under which Turney has solicited Busey Bank's employees lead to only one conclusion: in a blatant attempt to gain an unfair competitive advantage, Turney utilized Busey Bank information for the improper purpose of soliciting Busey Bank's employees and clients to both his and Flagstar's financial gain and Busey Bank's financial detriment.

42.    Moreover, Busey Bank has discovered evidence that the other named Former Employee Defendants in this action similarly and intentionally absconded with The Busey Bank Trade Secrets by virtue of sending themselves and each other emails containing customer lists replete with confidential information that the Former Employee Defendants would not have known or had access to but for their employment with Busey Bank.

43.    Accordingly, Busey Bank requires and respectfully requests damages and injunctive relief to prevent Former Employee Defendants and Flagstar from further soliciting Busey Bank employees and customers to preserve the *status quo ante*, to protect its goodwill and The Busey Bank Trade Secrets, and to prevent Turney and Flagstar from causing additional damage to Busey Bank.

## STATEMENT OF OPERATIVE FACTS

### *The Participation Agreements*

44.     The vast majority of the Former Employee Defendants and Related Individuals have signed an enforceable "Participation Agreement" ("Agreement") with Busey Bank containing confidentiality provisions as well as non-solicitation provisions.

45.     The Agreement contains numerous terms specifically intended to protect Busey Bank's customer relationships and information, information technology, training programs, business plans, and other confidential or proprietary information to which the Former Employee Defendants were granted access in order to perform the responsibilities of their jobs. The Agreements signed by Former Employee Defendants are attached as **Exhibits A-K**.

46.     The Agreements contain a robust confidentiality provision in which the Participant "acknowledges that the nature of Participant's employment requires that Participant produce and have access to records, data, Trade Secrets and information that are not available to the public ('Confidential Information')." *See Agreements,* attached as **Exhibits A-K**, at Section 1.

47.     The Agreements further include a provision regarding computer use and authorization, which provides as follows:

> Participant's access to and use of Busey's computer systems, networks and equipment, and all Busey information contained therein, shall be restricted to legitimate business purposes on behalf of Busey; any other access to or use of such systems, network and equipment is without authorization and is prohibited. The restrictions contained herein shall extend to any personal computers or other electronic devices of Participant that are used for business purposes relating to Busey. Participant shall not transfer any Busey information to any personal computer or other electronic device that is not otherwise used for any business purpose relating to Busey. Participant shall promptly return all originals and copies of any Confidential Information and other records, files, documents and other materials to Busey if Participant's employment with Busey is terminated for any reason. Participant acknowledges that violation of this Section 2 may subject Participant to both criminal and civil liability.

*See id.* at Section 2.

48.     The Agreements also include a non-solicitation covenant, which provides that for a 12-month period following the Participant's termination for any reason, the Participant shall not solicit Busey Bank's customers or employees. *See id.* at Section 5(a-b).

49.     The Agreements include a non-disparagement provision, which states that "Participant agrees that upon termination of Participant's employment for any reason Participant will not make any disparaging remarks about Busey or in any way demean the reputation of Busey or its employees, products or services." *See id.* at Section 6.

50.     Finally, the paragraph entitled "Remedies for Breach" clearly states that Busey Bank is entitled to injunctive relief for violations of the Agreement:

> [I]n the event of any violation or threatened violation of the restrictions contained in this Agreement, Busey, in addition to and not in limitation of, any other rights, remedies or damages available to Busey under this Agreement or otherwise at law or in equity, shall be entitled to preliminary and permanent injunctive relief to prevent or restrain any such violation by Participant and any and all persons directly or indirectly acting for or with him or her, as the case may be.

*See id.*

51.     Further, and in addition to the provisions within the Agreements, Busey Bank has implemented a number of policies that directly address access of and acceptable uses for Busey Bank's systems. The relevant portions of these policies are described at length by Ms. Kerri Doll, in her Declaration attached hereto as **Exhibit L**. In short, these policies provide that Busey Bank employees must only "use their privileged access for appropriate, legitimate, business required functions of Busey. All business, privileged users must perform actions in a manner that maintains the confidentiality, integrity, and availability for all Busey information" and that Busey Bank employees shall not: "[r]eveal or publicize confidential or proprietary information which includes, but is not limited to: financial information, confidential client information, marketing strategies

and plans, databases and any information contained therein, client lists, computer software source codes, computer/network access codes, and business relationships." *See id.*

52.     This Complaint will make clear that the Former Employee Defendants breached each of the above provisions, along with the various provisions of Busey Bank's Electronic Resources Acceptable Use Policy and Information Security Policy, and Flagstar aided, abetted, induced, and encouraged those breaches.

### *Turney's Role at Busey Bank*

53.     Turney is a former Busey Bank employee and officer. At the time he resigned from Busey Bank, Turney was employed as Senior Vice President - Mortgage Sales Division.

54.     In connection with his employment as Senior Vice President – Mortgage Sales Division at Busey Bank, Turney oversaw numerous Busey Bank employees, including the former Busey Bank employees identified as Related Individuals in Paragraph 5 herein and the Former Employee Defendants, who were responsible for originating loans that generate millions of dollars in annual revenues and profits for Busey Bank.

55.     Turney, as well as the several individuals whom he solicited to leave Busey Bank and join Flagstar, was provided with access to Busey Bank's extensive client records and information. Busey Bank paid Turney and provided him with opportunities to develop, cultivate, and maintain relationships with its clients, many of whom have now moved their relationships to Flagstar. At last count, the Related Individuals identified in Paragraph 5 herein and the Former Employee Defendants have solicited and transferred over 1,100 loan payoffs amounting to over $100 million from Busey Bank to Flagstar.

56.     For the Related Individuals and the Former Employee Defendants to have taken over 1,100 separate loans in just a few short months, there is no other conclusion than the Former Employee

12

Defendants and Related Individuals utilized The Busey Bank Trade Secrets to identify and solicit the business of Busey Bank's customers.

57.     Further, Turney and the many individuals whom he solicited to leave Busey Bank and join Flagstar also had numerous loans in their "pipelines" at Busey Bank. "Pipeline" refers to mortgage loans that are locked-in with a mortgage originator by borrowers, mortgage brokers, or other lenders. A loan stays in an originator's pipeline from the time it is locked until it falls out, is sold into the secondary mortgage market, or is put into the originator's loan portfolio. In this case, many of the loans in Busey's pipeline have fallen out and moved over to Flagstar, resulting in millions of dollars of loss to Busey Bank.

58.     The identities and contact information of Busey Bank's clients would be very valuable to competitors such as Flagstar because this information would identify customers who generate significant revenues, particularly in this time wherein roughly half of Busey's business is coming from existing customers who are refinancing their loans due to the historically low rates. Busey Bank's competitors such as Flagstar can unfairly benefit from this information because it would enable them to target their financial products, services, and marketing efforts to a pre-selected group of clients without the need to spend the significant amount of time, money, and resources Busey Bank has spent to generate its goodwill and identify and develop such clients.

59.     Busey Bank takes concerted action to preserve the confidentiality of its employee and client information.

### ***Turney and Flagstar Fraudulently Misrepresented Material Facts to Induce Busey Bank Employees Over Whom Turney Had Control To Join Flagstar While He Was Still An Employee Of Busey Bank***

60.     Turney resigned from Busey Bank on August 25, 2020 to join Flagstar.

13

61.     Prior to Turney's resignation, five Busey Bank employees in the Mortgage Sales division resigned from Busey Bank to join Flagstar. These individuals are: Barbara L. Weidner, Casey Wilson, Kimberly Sannella, Jeffrey Hopper, and Nicholas W. Villareal.

62.     Following Turney's resignation, fifteen more Busey Bank employees in the Mortgage Sales division resigned from Busey Bank to join Flagstar. These individuals are: Bradley David Gish, Christa A. Smith, Joseph Riley Mongiovi, Keith Frank Mouis, Kellie Marie LaMonaca, Kirk W. Tjernagel, Kyle R. Bernfield, Mark Thomas Dietrich, Randall I. Clark, David A. Besler, Ron Briscoe, Keri Kikta, Deborah Stoch, Milissa Welborn-Ommen, and Sandra Vick.

63.     The individuals identified in Paragraphs 61 and 62 above resigned and joined Flagstar as a direct result of Flagstar and Turney's coordinated effort to solicit Busey Bank employees while Turney was still employed by Busey Bank. This coordinated effort began in June of 2020.

64.     Busey Bank's review of the circumstances surrounding Turney's solicitation of employees and subsequent resignation revealed that while Turney was still employed at Busey, he requested recruitment materials from a representative of Flagstar, and then he and that Flagstar representative held a WebEx conference during business hours with numerous then-Busey employees for the purpose of soliciting those employees to resign from Busey Bank and join Flagstar to eventually work under Turney.

65.     On June 11, 2020, Turney forwarded from his personal email to his work email a calendar invite for a WebEx "marketing discussion" sent by Brian O'Connor and Christina Long, employees of Flagstar and Opes Advisors—a subsidiary of Flagstar—respectively. Turney also sent this email to Kellie LaMonaca, one of the former Busey Bank employees who later resigned to join Flagstar. On June 13, Turney also sent to several Busey employees recruitment information on products offered by Flagstar that he requested on the WebEx meeting with Flagstar

14

representatives. Turney then worked with Flagstar to organize another WebEx recruitment conference (titled "Marketing Review") scheduled for Tuesday June 23, 2020 during business hours, which included additional Flagstar employees such as Craig Goetz, along with at least six other then-Busey Bank employees. This series of emails and scheduled WebEx conference invitations is attached as **Composite Exhibit M**.

66.     In July, Turney began setting "information calls" with the Busey Bank employees in the Bloomington, IL office. A series of emails regarding these calls is attached as **Composite Exhibit N**. Following this meeting, Busey Bank's employees began resigning, and prior to doing so, many of them sent themselves or others confidential information.

67.     Turney continued to work with Flagstar Bank Regional Manager Craig Goetz to solicit other Busey Bank employees over the next several months.

68.     Some Busey Bank employees who did not resign reported that Turney had solicited them to join Flagstar, despite the fact that Turney was still employed by Busey Bank. Additionally, several Busey employees reported that in conjunction with soliciting these employees to join Flagstar, Turney and Flagstar falsely represented to them that Busey Bank was "getting out of the mortgage business." One such employee is Ms. Debbie Rybka, whose Declaration is attached to this Complaint as **Exhibit O**. As Ms. Rybka indicates in her Declaration, Mr. Turney directly supervised her, along with the other Former Employee Defendants and Related Individuals. *See* **Exhibit O** at ¶ 4. Prior to his resignation, Mr. Turney solicited Ms. Rybka to resign from Busey Bank and join Flagstar with him and other Busey Bank employees, and in the process invited her to join a conference with himself and Flagstar during business hours. *See* **Exhibit O** at ¶¶ 8-9. Busey Bank management approached Turney about these reports, and Turney resigned the following day, quickly followed by a number of the individuals identified herein. As Turney

maintained a higher-level officer position within Busey Bank, the employees he oversaw had no reason to doubt him, and were therefore swayed to resign from Busey Bank and join Flagstar. Ultimately, following their affiliation with Flagstar, many of the Former Employee Defendants have indicated that they felt lied to by Turney and Flagstar in the recruitment process and have suggested a desire to return to Busey Bank. *See* **Exhibit O** at ⁋ 15.

69.     Following Turney's resignation, Busey Bank continues to discover evidence indicating that Turney and the Former Employee Defendants have solicited and continue to solicit numerous Busey Bank employees and customers.

70.     Turney is now an "Area Manager" at Flagstar, managing many of the individuals he wrongfully solicited away from Busey Bank.

71.     While Turney was still in his Senior Vice President – Mortgage Sales Division role at Busey Bank, Flagstar and Turney worked in concert together to actively, fraudulently, and successfully mislead and solicit Busey Bank employees.

72.     However, the need for injunctive relief does not rest on the fraudulent representations damaging Busey Bank's goodwill and reputation alone, but is additionally buttressed by the Former Employee Defendants' and Flagstar's possession and use of Busey Bank information.

### *The Former Employee Defendants And Flagstar Are In Possession And Control Of Busey Bank Confidential Information and Trade Secrets*

73.     Since Turney's resignation, Turney, Flagstar, and its agents, including the Former Employee Defendants and Related Individuals, have contacted and solicited numerous Busey Bank customers.

74.     Upon information and belief, Turney removed and misappropriated confidential Busey Bank information, including but not limited to Busey Bank customer and employee personal

names and contact information. Flagstar and Turney have used both to continue making misrepresentations to—and soliciting—Busey Bank employees and customers.

75.     On September 24, 2020, Busey Bank employee Michael Ross received a text to his personal cell phone from Mr. Goetz, who solicited Mr. Ross to leave Busey Bank and join Flagstar. *See* **Exhibit P***, Text Message From C. Goetz to M. Ross.* On the same day, Mr. Goetz sent the same message to solicit two other Busey Bank employees, Sean Banigan and Carly Varner. Attached as **Exhibits Q and R**, respectively. Notably, on the day that the five employees in Busy Bank's Bloomington office resigned to join Flagstar, October 23, 2020, Mr. Goetz followed up with Ms. Varner again, attempting to solicit her, telling her, among other things, "[y]our old friends speak highly of you!" *See* **Exhibit R**.

76.     Upon information and belief, having already solicited numerous "large teams in Illinois" from Busey to Flagstar as referenced in the above-referenced text messages,[2] Turney provided Flagstar with personal contact information for Busey Bank employees under his command in an effort to indirectly solicit those employees away from Busey Bank, thereby competing with Busey Bank while still an employee. Without Turney or one of the other Former Employee Defendants or Related Individuals who were solicited providing such information, how else would Mr. Goetz at Flagstar procure the personal cell phone numbers of Mr. Ross, Mr. Banigan, and Ms. Varner, and use them with the direct intention of soliciting them to join Flagstar?

77.     Further, upon information and belief, as numerous customers have already been solicited away from Busey Bank, resulting in the loss of millions of dollars to Busey Bank, Turney provided Flagstar with personal contact information for Busey Bank customers known to him and/or those

---

[2] *See supra* Para. 75 and Exhibit P-R.

employees under his command in an effort to directly solicit those customers away from Busey Bank.

78.     Recognizing that Turney's and Flagstar's conduct constitutes multiple violations of Illinois state law that have resulted in significant monetary harm and reputational damage to Busey Bank, Busey Bank seeks both damages and immediate injunctive relief.

79.     Moreover, Busey Bank's review of the Former Employee Defendants' resignations from Busey Bank has revealed that the Former Employee Defendants intentionally removed Busey Bank confidential information and Trade Secrets in the form of customer lists.

80.     On July 24, 2020, Villareal, Weidner, and Sannella resigned. However, on that same day, and prior to their resignation, LaMonaca emailed Brad Gish's client list to Weidner. This email is attached as **Exhibit S**. As all of these employees knew who was resigning, LaMonaca's provision of a customer list to Weidner just prior to her resignation serves only to provide Busey customer information to a resigning employee for use on behalf of her new employer. Notably, Weidner was Gish's assistant, and Gish did not resign until weeks later. Upon information and belief, Weidner kept and is still in possession of this list, and moreover has likely disseminated and used it. The list contains confidential information for over 50 Busey Bank customers, including but not limited to extensive contact information, type of residence, loan amounts, interest rates, types of loans, close dates, loan to value ratios, customer credit scores, and co-borrower information and credit scores. Importantly, there are a number of Busey Bank customers whose names appear on this list and who have also already had their loans serviced at Flagstar.

81.     In the days prior to his resignation, beginning on August 25, 2020, Tjernagel sent himself various documents including closings lists, purchase matrices, copies of Closed Loan Commissions, and other documents containing Busey Bank confidential information prior to his

18

resignation on August 28, 2020. This series of emails is attached as **Exhibit T**. For example, one tab of the Closed Loan Commission spreadsheet Tjernagel sent himself contains information regarding 62 loans and "goals" for those loans, while also containing a tab titled "Solicit" that includes 423 rows of customer names with loan amounts, disbursement dates, loan rates, loan terms, and investor names. Another tab titled "MSI" contains over 300 rows of customer names and includes even more information about those loans such as when they were paid. Finally, another tab is titled "Busey" and includes 233 rows of customer names, closing dates, gross and net amounts, volumes, referral sources, payment status, investor names and loan rates and terms. Naturally, a number of the names on the "Busey" and "Solicit" tabs belong to Busey Bank customers whose loans have since been serviced at Flagstar. Tjernagel sent himself multiple other documents in the three days leading up to his resignation that included additional spreadsheets with similar information along with actual mortgage statements for clients, and even a Busey Home Mortgage analysis prepared by Tjernagel in his scope of employment for Busey Bank for a client that includes information ranging from sellers' tax credits to daily loan interest. Upon information and belief, Tjernagel kept and is still in possession of these documents, and moreover has likely disseminated and used them to solicit Busey Bank customers and benefit Flagstar.

82.     Further, Mark Dietrich emailed at least four documents to himself, including a client list and a Database. Attached as **Exhibit U**. Combined, these spreadsheets include extensive customer information, from borrower information ranging from name and address birth dates and employers. Dietrich emailed these documents from his Busey email address to his personal email address on September 27, 2020, and then resigned on the very next day, September 28, 2020. Why else, other than to use Busey Bank's information to compete against it on behalf of Flagstar, would Dietrich email those documents to himself the afternoon prior to his resignation?

83.     Similarly, Ommen-Welborn and Besler both resigned on October 23, 2020, and in the month prior to their resignation, each individual emailed similar documents to themselves containing Busey Banks' confidential information. Attached as **Exhibit V**.  On September 29, 2020, Ommen-Welborn sent from her Busey Bank email address to her personal email account spreadsheets titled "Final client list1", "BUSEY ORIGINAL CONTACTS", and "final client list." Much like the documents misappropriated by the other Former Employee Defendants, these documents contain over 1,000 rows combined of Busey Bank customer loan information ranging from contact information to loan type, amount, rate, and term. Ommen-Welborn also sent herself a 26-page Busey Bank PowerPoint presentation entitled "Busey's Special Mortgage Loan Programs." Similarly, on August 4, 2020, Besler sent himself a spreadsheet with 1,113 rows of customer information in a spreadsheet tab titled "Customer info." Upon information and belief, Ommen-Welborn and Besler kept and are still in possession of these documents, and moreover have likely disseminated and used them to solicit Busey Bank customers and benefit Flagstar.

84.     Accordingly, upon information and belief, Defendants and Related Individuals still have possession of and control over—and have used and will likely continue to use absent intervention from this court—The Busey Bank Trade Secrets.

85.     In an attempt to conserve judicial resources and settle its disputes out of court, Busey Bank's counsel spent months attempting to resolve these issues as to the wrongful retention and use of Busey Bank's information, and Defendants have refused to acknowledge the same. On October 27 and 28 of 2020, Busey Bank sent correspondence, along with litigation hold letters, to each former employee of Busey Bank identified in this action and to Flagstar, demanding written assurances that the former employees would comply with their respective continuing obligations to Busey Bank under their agreements.

86. Despite Busey Bank's written demand that the former employees abide by their respective contractual obligations and provide assurances that they had done so, Defendants, on information and belief, have not taken any steps to ensure the covenants contained in the Agreements are not breached and have not provided the necessary assurances.

87. In addition, the former employees have engaged in business on behalf of Flagstar with customers and referral sources with whom they had contact, and about whom they learned confidential and proprietary information, while they were employed by Busey Bank.

88. Given that Flagstar hired over twenty former Busey Bank employees and has been allowing those employees to utilize on its behalf confidential and proprietary Busey Bank information that they possess, on information and belief, Flagstar has encouraged and acted in concert and cooperation with the Former Employee Defendants and Related Individuals to engage in wrongful solicitation of Busey Bank's customers, carriers, and employees, to engage in unfair competition against Busey Bank, and to access and utilize improperly Busey Bank's confidential and proprietary information.

89. In this manner, Flagstar willfully, knowingly, and intentionally induced the Former Employee Defendants and Related Individuals to breach their respective covenants and obligations under their Agreements with the purpose of injuring Busey Bank's business and developing its own in a state in which it had little to no presence (Illinois).

90. Flagstar and the Former Employee Defendants continue to engage in activities that violate their Agreements, tortiously interfere with Busey Bank's contracts and business relations, cause the actual or threatened misappropriation of Busey Bank Trade Secret, and unfairly compete with Busey Bank.

91. Busey Bank will continue to suffer irreparable harm unless this Court grants injunctive relief restraining Defendants from further breaches of Busey Bank's rights.

## COUNT I

## TEMPORARY AND PRELIMINARY INJUNCTION

92. The allegations of Paragraphs 1 through 91 are incorporated by reference herein with the same force and effect as if set forth in full below.

93. By virtue of the foregoing, Busey Bank has demonstrated that Defendants have caused and will continue to cause irreparable injury in the absence of the entry of injunctive relief; that the threatened injury to Plaintiff outweighs the harm to the Defendants resulting from such an order; that the injunction is not adverse to public interest; and that the moving party has a substantial likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Defendants.

94. Unless Defendants are temporarily and/or preliminarily enjoined from making fraudulent misrepresentations regarding Busey Bank, retaining and using The Busey Bank Trade Secrets, and soliciting Busey Bank customers and employees Busey Bank will continue to be irreparably harmed by: (a) disclosure and misuse of trade secrets, client lists, and/or other confidential information that are solely the property of Busey Bank and its clients; (b) loss of confidentiality of the information contained in clients' records, loss of confidentiality of clients' financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; (c) damage to office stability, and a threat to the enforcement of reasonable contracts; and (d) present economic loss, which is, to a degree, unascertainable at this time, and future economic loss, which is presently incalculable.

95. Busey Bank otherwise has no adequate remedies at law.

## COUNT II

## UNFAIR COMPETITION

96.    The allegations of Paragraphs 1 through 91 are incorporated herein by reference with the same force and effect as if set forth in full below.

97.    Within the restricted time-period in the employee non-solicitation provisions of the Agreements, Flagstar, with the assistance of the Former Employee Defendants, both before and after their affiliation with Flagstar, has systematically raided Busey Bank's mortgage loan origination work force in order to (a) bolster and expand its own business performance in a competitive market, (b) establish a new and immediately competitive mortgage loan presence in Illinois, and (c) obtain and exploit Busey Bank's confidential, proprietary, trade secret, and highly sensitive business information. This raiding has been at Busey Bank's expense.

98.    Flagstar's misconduct constitutes a misappropriation of Busey Bank's labors and expenditures and constitutes unfair competition and improperly undermines the stability of Busey Bank's workforce.

99.    Unless enjoined, Flagstar will continue to raid Busey Bank's work force in order to bolster and expand its business performance and to obtain and continue to exploit Busey Bank's confidential, proprietary, and highly sensitive business information, all at Busey Bank's expense.

100.    Busey Bank has suffered, and will continue to suffer, irreparable harm as the result of the aforementioned unfair competition.

101.    Busey Bank has no adequate remedy at law. The injury to Busey Bank's business is not easily quantified, and monetary damages cannot by themselves adequately compensate Busey Bank for the competitive injury resulting from Defendants' unfair competition.

102.    The balance of hardships and the public's interest favor granting injunctive relief in favor of Busey Bank and enjoining Defendants' from unfairly competing with Busey Bank.

103.    As a direct and proximate result of Flagstar's wrongful acts, Busey Bank has suffered damages in an amount to be determined at trial.

**COUNT III**

**MISAPPROPRIATION OF TRADE SECRETS**

**(Violation of Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq.) (as to all Defendants)**

104.    The allegations of Paragraphs 1 through 91 are incorporated herein by reference with the same force and effect as if set forth in full below.

105.    The above-alleged facts constitute actual and threatened misappropriation of trade secrets by Former Employee Defendants under the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* (the "ITSA") and the DTSA.

106.    Busey Bank assigned and referred clients to Former Employee Defendants so that they could service them on Busey Bank's behalf. Busey Bank provided them with confidential information solely for the purpose of performing their jobs at Busey Bank, and continually updated that information throughout the years that Former Employee Defendants were employed.

107.    Busey Bank Trade Secret client information is not generally known by third parties, and is not readily ascertainable by proper means by third parties.

108.    Busey Bank derives significant economic and competitive advantage in the financial services industry from maintaining the secrecy and confidentiality of its trade secret client information.

109.    The Busey Bank Trade Secret client information, including the names, addresses, phone numbers, account and loan information, and other information concerning the customers and loans

assigned to Former Employee Defendants, is subject to reasonable efforts by Busey Bank to maintain its secrecy, and its employees are required to maintain the secrecy and/or confidentiality of that information.

110.    Busey Bank's confidential information constitutes a trade secret under the ITSA.

111.    In addition, the names, addresses and contact information of Busey Bank clients are protected from disclosure as personally identifiable information under the Gramm-Leach-Bliley Act and its implementing federal regulations, commonly referred to as Regulation S-P. *See* 17 C.F.R. § 248. Even the fact that an individual is a client of a specific financial institution – here, Busey Bank – is protected from disclosure under Regulation S-P. 17 C.F.R. § 248.3. These federal regulations underscore the highly confidential nature of financial services client information.

112.    Former Employee Defendants have improperly and without authorization misappropriated, retained, and/or exploited The Busey Bank Trade Secrets, including Busey Bank's confidential client information. Upon information and belief, they have done so for the purposes of aiding their solicitation of clients to have their loans serviced by Flagstar, a competing firm with which they have all become associated.

113.    Former Employee Defendants' continued retention of The Busey Bank Trade Secret client information, as alleged herein, constitutes actual and threatened misappropriation of trade secrets pursuant to the ITSA and the DTSA, and is willful and malicious.

114.    Because Defendants' unlawful conduct is ongoing, Busey Bank faces a threat of continuing irreparable harm, for which Busey Bank lacks any adequate remedies at law.

115.    Unless Defendants are enjoined from the foregoing conduct, Busey Bank will be irreparably harmed by: (a) disclosure of The Busey Bank Trade Secret client information, including confidential account information that is solely the property of Busey Bank; (b) loss of

goodwill; and (c) present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable. An award of money damages alone will be insufficient and inadequate to remedy Busey Bank's injuries arising out of the misappropriation of its trade secrets.

## COUNT IV

### Violations of Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836(b) (as to all Defendants)

116.     The allegations of Paragraphs 1 through 91 are incorporated herein by reference with the same force and effect as if set forth in full below.

117.     Busey Bank is the owner of valuable trade secrets used in, or intended for use in, interstate or foreign commerce. Those trade secrets include, but are not limited to, detailed compilations of customer information, competitive loan information, referral source information, history and performance information, sales records and documents, marketing and sales strategies, long- range plans, competitive strategies, and personnel related information.

118.     This information constitutes "trade secrets" under 18 U.S.C. § 1839(3) because (a) it is sufficiently secret to derive economic value from not being generally known to other persons who can obtain economic value from its disclosure or use; and (b) Busey Bank takes reasonable measures to safeguard the secrecy of the information.

119.     Upon information and belief, by accepting positions with Flagstar, one or more of the Former Employee Defendants and Related Individuals have disclosed or will disclose, and/or have used or will use, The Busey Bank Trade Secrets for the benefit of Flagstar.

120.     Flagstar knows or should know that Former Employee Defendants and Related Individuals acquired the trade secrets by improper means.

121.   The Busey Bank Trade Secrets, as described in the preceding paragraphs, derive independent economic value from the fact that they are not generally known by, and are not readily ascertainable through proper means by, the general public or Busey Bank's competitors.

122.   The Busey Bank Trade Secrets represent the results of substantial efforts and investments by Busey Bank.

123.   Busey Bank also takes extraordinary measures to maintain the continued secrecy of its trade secret information, including, but not limited to, installing password protection of its electronically-stored information, limiting access to those who need such information, requiring password protection, and passcodes and ID badges to gain access to technology and areas of the building in which confidential information is stored..

124.   By using and/or threatening to use The Busey Bank Trade Secrets in its business, Flagstar has misappropriated The Busey Bank Trade Secrets as defined in 18 U.S.C. § 1839(5).

125.   Flagstar's misappropriation and/or threatened misappropriation of The Busey Bank Trade Secrets are willful and malicious.

126.   Under 18 U.S.C. § 1836(b)(3), Flagstar's misappropriation and/or threatened misappropriation of trade secrets may—and should—be enjoined by this Court.

**COUNT V**

**Violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030 et seq.) (as to**

**Former Employee Defendants)**

127.   The allegations of Paragraphs 1 through 91 are incorporated herein by reference with the same force and effect as if set forth in full below.

128.   The Computer Fraud and Abuse Act (the "CFAA") provides a trespass-like civil remedy under federal law when a third party accesses a database, website, or other protected computer,

without permission or exceeds authorized access. Specifically, the CFAA provides for the entry of civil injunctive relief as well as the recovery of money damages for a violation of its provisions. *See Mintel Int'l Grp., Ltd. v. Neergheen*, No. 08-CV-3939, 2008 WL 2782818, at *2 (N.D. Ill. July 16, 2008) (quoting 18 U.S.C. § 1030(g)) (providing that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief"). In *Mintel,* this Court stated, "Courts have upheld the use of the CFAA in granting injunctive relief against former employees and their new employers who have attempted to obtain a competitive edge by removing information from a former employer's computers."[3]

129.    The CFAA prohibits a number of different specific acts of misconduct involving access to protected computers (and mobile phones or other computerized devices).

130.    The CFAA "provides two ways of committing the crime of improperly accessing a protected computer: (1) obtaining access without authorization; and (2) ***obtaining access with authorization but then using that access improperly***." Musacchio v. United States, 136 S. Ct. 709, 713 (2016). As explained by the Fifth Circuit, "courts have interpreted 'access without authorization' as targeting outsiders who access victim systems, while 'exceeds authorized access' is applied to 'insiders, such as employees of a victim company…. [The CFAA punishes] those who have no permission to access a system and those who have some permission to access but exceed it ….'" *United States v. Thomas*, 877 F.3d 591, 596 (5th Cir. 2017) (citations omitted).

131.    The Former Employee Defendants' misconduct in the instant case falls squarely under 18 U.S.C.A. § 1030(a)(4), which provides that a violation occurs when an individual "knowingly and

---

[3] *Id.*; See, e.g., *YourNetDating, LLC v. Mitchell*, 88 F.Supp.2d 870, 872 (N.D.Ill.2000) (granting TRO under CFAA claim against former employee); *see also Charles Schwab & Co., Inc. v. Carter*, 2005 WL 351929, at *3 (N.D.Ill. Feb.11, 2005) (denying motion to dismiss claim under CFAA); *George S. May Int'l Co. v. Hostetler*, 2004 WL 1197395, at *3 (N.D.Ill. May 28, 2004).

with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value."

132.    The Former Employee Defendants are liable under the CFAA for a multitude of reasons and under multiple analyses. The first theory includes Former Employee Defendants' loss of agency, and therefore access to The Busey Bank Trade Secrets by virtue of their breaches of fiduciary duties. A breach of a duty of loyalty can terminate an agency relationship, and termination of that relationship makes the accessing of computer files that had previously been authorized transform into unauthorized access under the CFAA. *NCMIC Fin. Corp. v. Artino*, 638 F. Supp. 2d 1042, 1060 (S.D. Iowa 2009), *modified*, No. 4:07-CV-00204-JEG, 2009 WL 10669611 (S.D. Iowa Nov. 10, 2009).

133.    On the first theory, "the authority of an agent terminates if, without knowledge of the principal, he acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal."[4] In a similar case, *Artino,* the court found this exact phenomenon occurred when the Defendant "decided to compete against [Plaintiff] and subsequently e-mailed [Plainitff's] customer spreadsheet to his personal e-mail account.[5] Similarly, the Former Employee Defendants in the instant case are guilty of the same conduct, and therefore the termination of their agency relationships makes their accessing of computer files that had previously been authorized transform into unauthorized access under the CFAA. *Id.* Much like the Defendant in *Aritno,* where the court found that Defendant acted "without authorization" or "exceeded authorized access" within meaning of the CFAA when he accessed confidential and proprietary business information from his employer's computer that he had permission to access, but then used that information in

---

[4] *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc*., 119 F.Supp.2d 1121, 1126 (W.D.Wash.2000) (quoting Restatement (Second) of Agency § 11).
[5] *Artino*, 638 F. Supp. 2d at 1061.

a manner in breach of his duty of loyalty, with the intent to use the information in that manner at the time of access, the Former Employee Defendants committed the same misdeeds in this case.

134.    On the second theory, Busey Bank's CFAA claim can rest on the allegation that Former Employee Defendants' conduct breached Busey Bank's computer policies and the Confidentiality and Computer Use and Authorization provisions in the Agreements. *See supra* Paragraph 38. Courts have held that these types of violations can form the basis of a CFAA violation.[6]

135.    Ultimately, the Former Employee Defendants acted "without authorization" or "exceeded authorized access" within the meaning of the CFAA; they acted with intent to defraud Busey Bank under the CFAA when they violated Busey Bank's property rights to obtain something of value by accessing its customer spreadsheets and e-mailing confidential information from their work e-mail accounts to their personal e-mail accounts, or otherwise retaining the same, without authorization, and by using the customer spreadsheets and other Busey Bank documents and information for their own personal gain and against company's financial interests. 18 U.S.C.A. § 1030(a)(4).

136.    As a direct and proximate result of the Former Employee Defendants' actions, Busey Bank has suffered damages in an amount to be determined at trial.

## COUNT VI

## FAITHLESS SERVANT DOCTRINE (as to Former Employee Defendants)

137.    The allegations of Paragraphs 1 through 91 are incorporated herein by reference with the same force and effect as if set forth in full below.

---

[6] *See EF Cultural Travel BV v. Zefer Corp.*, 318 F.3d 58, 62 (1st Cir.2003) (holding that an employee breached his confidentiality agreement with his ex-employer when the employee used confidential information he obtained as an employee to obtain information from his ex-employer's website thereby exceeding his authorized access in violation of the CFAA).

138.    Illinois, like many other states, recognizes the Faithless Servant Doctrine, which provides that an employee who violates his or her duty of loyalty or fidelity in the performance of his or her employment duties forfeits the right to compensation therefor. *See generally Sidway v. Am. Mortg. Co.*, 222 Ill. 270, 275, 78 N.E. 561, 563 (1906) ("The law is that the agent is entitled to his commission only upon a due and faithful performance of all the duties of his agency in regard to his principal . . . If the agent does not perform his appropriate duties, or if he is guilty of gross negligence or gross misconduct or gross unskillfulness in the business of his agency, he will not only become liable to his principal for any damages which he may sustain thereby, but he will also forfeit all his commissions.") (quoting *Story on Agency*, § 331; 1 AM. & ENG. ENCY. OF LAW (2d Ed.) 1101 (internal citations omitted)); *Salus Capital Partners, LLC v. Moser*, 289 F. Supp. 3d 468 (S.D. N.Y. 2018) (finding that an employee who is found to be faithless in his performance of services to his employer is generally liable for all compensation received from the date of the breach, regardless of whether the faithlessness caused damages) (*applying New York law*).

139.    While still employed and compensated by Busey Bank, Former Employee Defendants—especially Turney—were faithless in their duties to their employer by virtue of their misconduct in conspiring to misappropriate The Busey Bank Trade Secrets, violate contractual obligations, divert business opportunities to a competitor, and breach their duties of loyalty to Busey Bank.

140.    As such, under the Faithless Servant Doctrine, the Former Employee Defendants are liable to forfeit all compensation paid to them during their time of disloyalty, which would span a period of several months from at least June 11 of 2020 (with the expectation that further discovery will result in an even earlier date) through the dates of resignation of each Former Employee Defendant: Turney, August 25, 2020; Ommen-Welborn, Clark, Briscoe, and Vick October 23, 2020; Weidner

and Villareal, July 24, 2020; Tjernagel and Mongiovi August 28, 2020; Kikta and Stoch, August 29, 2020; Mouis, September 4, 2020; Gish, September 1, 2020; and Hopper, August 22, 2020.

**COUNT VII**

**BREACH OF FIDUCIARY DUTIES (as to Former Employee Defendants)**

141. The allegations of Paragraphs 1 through 91 are incorporated herein by reference with the same force and effect as if set forth in full below.

142. The Former Employee Defendants and Related Individuals owed fiduciary duties to their employer.

143. In a recent Consent Order with a mortgage loan originator, the Office of the Comptroller of the Currency ("OCC") found that mortgage loan originators, like those involved in this case, owe fiduciary duties to their employers. *See In the Matter of: Stacy Folkers Former Residential Loan Originator Barrington Bank & Trust Company, N.a. Barrington, Illinois*, 2018 WL 3844493, at *1. The Consent Order found that while still employed by one bank, the Respondent sent customers' information to the financial institution at which she had accepted a new position, and several of those customers eventually obtained loans from the second financial institution, which resulted in approximately $1.14 million in mortgage loans from that institution and some pecuniary benefit to her personally. *See id.* The OCC found that the "Respondent recklessly engaged in unsafe or unsound practices and breached her fiduciary duty to the Bank; which practices and breaches were part of a pattern of misconduct, caused or were likely to cause more than a minimal loss to the Bank, and resulted in pecuniary gain to Respondent."

144. In general, the duty of loyalty requires that an employee act "solely for the benefit of the [employer] in all matters connected with [his or her] employment." *Riad v. 520 Michigan Avenue Associates*, 2000 WL 680217, *3 (N.D.Ill.2000).

32

145.    Further, regardless of whether any of the Former Employee Defendants were officers or regular employees, they still owed fiduciary duties to their employer. Those basic duties prohibit even non-officers from, in relevant part, competing with the employer while still employed[7] and taking a customer list while still employed.[8]

146.    Similarly, Turney and Flagstar set multiple recruitment and informational meetings with other Busey Bank employees during business hours for the purpose of soliciting those individuals away from Busey Bank while Turney and the other individuals were all still employed by Busey Bank. This constitutes a clear breach of Turney's fiduciary duties to his employer. *See Veco Corp. v. Babcock*, 243 Ill. App. 3d 153, 163, 611 N.E.2d 1054, 1061 (1993) ("Corporate officers are liable for breaching their fiduciary duties where, while still affiliated with the company, they solicit fellow employees to join a rival business or orchestrate a mass exodus of employees to follow shortly the officer's resignation from the company."); *see* also Preferred Meal Systems, 199 Ill.App.3d at 725, 145 Ill.Dec. 736, 557 N.E.2d 506 (" . . . officers are liable for breaching their fiduciary duties where, while still employed by the company, the officer has: (1) failed to inform his employer that other employees were forming a rival company or engaging in other fiduciary breaches . . . (2) solicited fellow employees to join a rival business . . . (4) used the company's facilities or equipment to assist him in developing his new business, or appropriated its money or equipment for that purpose . . . (5) used the company's confidential business information for the new business, either before or after his departure . . . or (6) orchestrated a mass exodus of employees shortly after defendant's resignation from the company.").

147.    Many of the individuals who took part in the mass, staggered resignation scheme also took customer lists. LaMonaca, while still employed, sent one to Weidner the morning of her

---

[7] *See Lawler v. North American Corp. of Illinois*, 2012 IL 112530, 983 N.E.2d 414, 433-434 (Ill. 2012)
[8] *See Id.*

resignation, presumably for her use at Flagstar. LaMonaca remained employed by Busey for another month afterward.

148.    The Former Employee Defendants intentionally breached the fiduciary duties they owed to their employer, Busey Bank.

149.    The Former Employee Defendants' breaches of their fiduciary duties to Busey Bank have damaged Busey Bank.

150.    Remedies for the Former Employee Defendants' breaches of their fiduciary duties include recovery of the employees' total compensation paid during the time that the employee was breaching the fiduciary duty owed to the employer,[9] the imposition of a constructive trust to collect the profits reaped by the employee as a result of the breach of his or her fiduciary duty,[10] recovery of bonuses paid during the same period in which the employee breached his or her fiduciary duty,[11] the imposition of punitive damages if the breach was intentional and without just cause,[12] and injunctive relief.[13]

## COUNT VIII

## CIVIL CONSPIRACY

151.    The allegations of Paragraphs 1 through 91 are incorporated herein by reference with the same force and effect as if set forth in full below.

---

[9] *See Dowd and Dowd, Ltd. v. Gleason*, 816 N.E.2d 754, 772 (1st Dist. 2004); *see also Levy v. Markal Sales Corporation*, 268 Ill.App.3d 355, 373, 643 N.E.2d 1206 (1st Dist. 1994).
[10] *See Lindenhurst Drugs, Inc. v. Becker*, 154 Ill.App.3d 61, 71, 506 N.E.2d 645, 650 (2d Dist. 1987); *see also Hill v. Names & Addresses*, 212 Ill.App.3d 1065, 1083, 571 N.E.2d 1085 (1st Dist. 1991) (constructive trust may be imposed even when it more than compensates plaintiff for injury resulting from breach of loyalty because the right to recover from one who exploits his fiduciary position for his personal benefit is triggered by gain to agent rather than loss to principal).
[11] *See Gleason*, 816 N.E.2d at 772.
[12] *See Hill*, 511 N.E.2d at 1098; *Gleason*, 816 N.E.2d at 773; *Markal Sales*, 268 Ill.App.3d at 379.
[13] *See Superior Environmental Corp. v. Mangan*, 247 F.Supp.2d 1001, 1003 (N.D.Ill. 2003).

34

152.     Upon information and belief, Flagstar and the Former Employee Defendants were aware of the contractual obligations owed by the individuals who engaged in the mass, staggered resignation from Busey Bank under the Agreements with Busey Bank.

153.     Upon information and belief, Flagstar and the Former Employee Defendants knowingly and willingly conspired and agreed between themselves to breach the customer and employee non-solicitation provisions of the Agreements, the Former Employee Defendants' fiduciary duties to Busey Bank, and/or confidentiality provisions contained in the Agreements.

154.     The object Flagstar and the Former Employee Defendants sought to accomplish—and indeed what was accomplished—was to gain an improper competitive advantage, injure Busey Bank's business, and strain Busey Bank's customer and employee relationships.

155.     Flagstar and the Former Employee Defendants committed and caused to be committed one or more overt and unlawful acts in furtherance of the conspiracy, including, but not limited to, the misappropriation of The Busey Bank Trade Secrets, the solicitation of Busey Bank co-employees, and the solicitation of Busey Bank customers.

156.     As a direct and proximate result of Flagstar's and the Former Employee Defendants' actions, Busey Bank has suffered damages in an amount to be determined at trial.

## COUNT IX

## TORTIOUS INTERFERENCE WITH BUSEY BANK'S BUSINESS RELATIONSHIPS AND/OR EXPECTANCY WITH ITS CUSTOMERS

157.     The allegations of Paragraphs 1 through 91 are incorporated herein by reference with the same force and effect as if set forth in full below.

158.     At all relevant times, Busey Bank has had business relationships with its customers.

159.   At all relevant times, Busey Bank has reasonably expected that its business relationships with its customers would continue and Busey Bank has invested time, effort, and money in developing and maintaining those business relationships.

160.   Flagstar and the Former Employee Defendants knew and were aware of the business relationships between Busey Bank and its customers.

161.   Flagstar and the Former Employee Defendants intentionally, willfully, and without justification interfered with Busey Bank's business relationships with its customers by soliciting, or otherwise conducting business with, Busey Bank's customers and by inducing Busey Bank's former employees to breach their post-employment contractual obligations to Busey Bank, to solicit Busey Bank's customers, and to disclose Busey Bank's confidential information.

162.   Specifically, Turney, who had a managerial role as Senior Vice President – Mortgage Sales Division, was acutely aware of the business relationships serviced by himself and the other Former Employees and Related Individuals, and he knew that by soliciting the customers along with the other Former Employees and Related Individuals he would be interfering with those relationships. Turney was further aware of the great value of these relationships to Busey Bank, and the detrimental impacts his actions would have on the mortgage business.

163.   Upon information and belief, Defendants' purposeful and improper interference has had the desired effect as over twenty former employees have moved to Flagstar the business of Busey Bank customers.

164.   Unless enjoined, Flagstar will continue to induce the former Busey Bank employees to breach their respective Agreements, to solicit Busey Bank's customers, and to disclose Busey Bank's confidential information, in order to solicit Busey Bank's customers for the benefit of Flagstar.

165.     Busey Bank has suffered, and will continue to suffer, irreparable harm as the result of Defendants' interference with its business relationships and/or expectancy with its customers.

166.     Busey Bank has no adequate remedy at law. The injury to Busey Bank's business is not easily quantified, and monetary damages cannot by themselves adequately compensate Busey Bank for the competitive injury resulting from Defendants' intentional and improper interference with Busey Bank's business relationships and/or expectancy with its customers.

167.     The balance of hardships and the public's interest favor granting injunctive relief in favor of Busey Bank and enjoining Defendants from wrongfully and improperly interfering with Busey Bank's business relationships and/or expectancy with its customers.

168.     As a direct and proximate result of Defendants' wrongful acts, Busey Bank also has suffered damages in an amount to be determined at trial.

## COUNT X

## TORTIOUS INTERFERENCE WITH BUSEY BANK'S AGREEMENTS

169.     The allegations of Paragraphs 1 through 91 are incorporated herein by reference with the same force and effect as if set forth in full below.

170.     The Agreements are valid and enforceable contracts as between Busey Bank and the Former Employee Defendants.

171.     Busey Bank possesses valid and valuable contractual relationships with its employees, like the Former Employee Defendants and the other former employees who also resigned, and Busey Bank achieves economic gain as a result of its contractual relationships with its employees.

172.     Specifically, Turney's managerial role imputed a heightened duty to Busey Bank as well as a heightened understanding of its Agreements with its employees. Turney exercised management-level authority over the Former Employee Defendants and Related Individuals to

influence their decision to leave Busey Bank by telling them that Busey was leaving the mortgage industry. As a manager, Turney was acutely aware of the Agreements as and between Busey Bank and the Former Employees and Related Individuals, and he knew that by soliciting the customers along with the other Former Employees and Related Individuals he would be interfering with those Agreements. Turney was further aware of the great value of these Agreements and relationships to Busey Bank, and the detrimental impacts his actions would have on the mortgage business.

173. Upon information and belief, Defendants knew and were aware of the contractual relationships and obligations between Busey Bank and the former employees who engaged in the staggered mass resignation from Busey Bank.

174. Upon information and belief, Defendants have intentionally, willfully, and without justification induced or attempted to induce the former employees to breach their obligations under their Agreements.

175. As a result of Defendants' wrongful acts, the Former Employee Defendants and other former employees breached provisions of their Agreements, resulting in (a) an unfair competitive advantage to a Busey Bank competitor; and (b) the use and/or disclosure of Busey Bank's confidential information and the misuse of the goodwill that Busey Bank has developed with its customers and employees for the benefit of Flagstar and to the detriment of Busey Bank.

176. Unless enjoined, Defendants will continue to induce the former employees to violate their respective Agreements and facilitate their providing an improper competitive advantage to a Busey Bank competitor.

177. Busey Bank has suffered, and will continue to suffer, irreparable harm as the result of Defendants' interference with the Agreements, and the resulting breach of customer and employee non-solicitation provisions and the use and disclosure of Busey Bank's confidential information.

178.    Busey Bank has no adequate remedy at law. The injury to Busey Bank's business is not easily quantified, and monetary damages cannot by themselves adequately compensate Busey Bank for the competitive injury resulting from the breach of the Agreements induced by Defendants.

179.    The balance of hardships and the public's interest favor granting injunctive relief in favor of Busey Bank and enjoining Defendants from inducing any further breaches of the Agreements and making use of or disclosing Busey Bank confidential information.

180.    As a direct and proximate result of Defendants' wrongful acts, Busey Bank has suffered damages in an amount to be determined at trial.

## COUNT XI

### Breach of Contract (as to all Former Employee Defendants with Agreements)

181.    The allegations of Paragraphs 1 through 91 are incorporated herein by reference with the same force and effect as if set forth in full below

182.    The Agreements are valid and enforceable contracts between Busey Bank and Former Employee Defendants.

183.    Former Employee Defendants have breached the confidentiality, non-solicitation of customers and employees, and computer use and authorization provisions of their Agreements.

184.    Busey Bank has performed all of its obligations to Former Employee Defendants under their respective Agreements.

185.    On information and belief, the Former Employee Defendants have breached the non-solicitation provisions of their respective Agreements by inducing or assisting other former Busey Bank employees and Flagstar in soliciting Busey Bank customers and/or hiring Busey Bank employees.

186.    Busey Bank has clearly ascertainable rights and protectable interests in its confidential information, employee data, and in maintaining a stable workforce.

187.    The employee and customer non-solicitation provisions are reasonably necessary and narrowly tailored to protect Busey Bank's ascertainable rights and protectable legitimate business interests.

188.    Further, the time limitation regarding the non-solicitation provisions is only twelve months, which is a reasonable period of time.

189.    The Former Employee Defendants' breaches of the employee and customer non-solicitation provisions contained in their respective Agreements have caused and will in the future cause Busey Bank to suffer irreparable harm, including lost business, lost goodwill, and strained customer relationships.

190.    The Former Employee Defendants' continued and further breaches of the employee and customer non-solicitation provisions contained in their respective Agreements will cause, and have caused, Busey Bank to suffer further lost business, business costs related to a decline in the stability of its workforce, lost goodwill, and erosion to customer relationships.

191.    Busey Bank has no adequate remedy at law.

192.    The balance of hardships and the public's interest favor granting injunctive relief in favor of Busey Bank and enjoining Former Employee Defendants from any further breaches of their respective Agreements.

193.    Further, as a consequence of the Former Employee Defendants breaches of the employee and customer non-solicitation provisions of their respective Agreements, Busey Bank has suffered damages in an amount to be determined at trial.

## COUNT XII

### Inducement of Breach of Fiduciary Duty (as to Flagstar)

194.    The allegations of Paragraphs 1 through 91 are incorporated herein by reference with the same force and effect as if set forth in full below

195.    While still serving as an officer and employee of Busey Bank, Turney collaborated with Flagstar and actively plotted a scheme wherein over twenty employees would leave Busey Bank and join Flagstar where Turney would oversee and mange many of them. Flagstar, which had very little business in the state of Illinois, had the simple goal of stealing Busey Bank's productive employees and thereby its Illinois mortgage business.

196.    Flagstar induced Turney, as well as the other employees who resigned from Busey Bank identified in this Complaint, to breach their fiduciary duties through Flagstar's promises and assurances of future compensation. *See* Paragraphs 143 and 146 herein under **Count VII** detailing case law regarding breach of fiduciary duties.

197.    Flagstar knowingly accepted the benefits of the breaches of fiduciary duty.

198.    Busey Bank has suffered and will continue to suffer significant damages resulting from Flagstar's tortious conduct.

199.    Busey Bank's relationships with its employees has been irreparably harmed. This harm is ongoing, and as a direct result of Defendants' wrongful conduct will continue to cause tremendous damage to Busey Bank in the forms of lost goodwill and lost profits, among other things.

### PRAYER FOR RELIEF

**WHEREFORE**, by virtue of the foregoing acts and conduct complained of in Counts I through XII, Busey Bank respectfully requests entry of a preliminary injunction against Defendants, and respectfully requests:

(1)     That the Court enjoin Defendants, directly or indirectly, and whether alone or in concert with others, from:

   a.  using, disclosing, or transmitting for any purpose, including the solicitation or conducting of business with Busey Bank clients, the information contained in the records of Busey Bank, or other information pertaining to Busey Bank clients, including, but not limited to, the names, addresses, email addresses, telephone numbers, personal data and financial information of the clients (excluding members of Former Employee Defendants' immediate families); and

   b.  soliciting any business from any customer of Busey Bank whom Former Employee Defendants serviced at Busey Bank, and/or any customers whose identities Former Employee Defendants learned as a result of being a employed by or affiliated with Busey Bank (the "Customers"), including for the purpose of inviting, encouraging, or requesting the Customers to divert business from Busey Bank (excluding members of Former Employee Defendants immediate families); and

   c.  destroying, erasing or otherwise making unavailable for further proceedings in this matter, any records or documents (including data or information maintained in computer files or other electronic storage media) in Former Employee Defendants' possession or control which were obtained from, or contain information derived from, any Busey Bank records, which pertain to Busey Bank's clients, or which relate to any of the events alleged in the Complaint in this action.

(2)     That Former Employee Defendants are compelled, directly or indirectly, and whether alone or in concert with others, including any officer, agent, employee and/or representative of Former Employee Defendants' new employer to provide to Busey Bank's counsel any and all records or information pertaining to Busey Bank's clients or its business, and/or which were obtained by Defendant as a result of being a registered representative with Busey Bank, whether in original, copied, handwritten or any other form, and purge any such records and information from their possession, custody, or control, within 48 hours of notice to Defendants or their counsel of the terms of the Court's Order; provided, however, that any records and information in computerized or electronic form (including but not limited to personal computers, laptop computers, tablet devices, iPhones, Android phones, mobile telephones and any other device in, or on, which data can be electronically stored) shall be provided by Defendants to counsel within 48 hours of notice to Defendants or counsel of the terms of the Court's Order, and that Defendants' counsel shall preserve the integrity of such devices and immediately make any and all such devices available for inspection and duplication by Busey Bank's counsel and/or computer forensic consultants.

(3)     Award Busey Bank all damages available including but not limited to compensatory damages, punitive damages, unjust enrichment and restitution damages, disgorgement of profits, and exemplary damages;

(4)     Award Busey Bank all of its attorneys' fees incurred in connection with this action;

(5)     Any other relief that the Court deems necessary, appropriate, or proper.

Dated this 28th day of May, 2021.

Respectfully submitted,

/s/ Tricia L. Putzy
Tricia L. Putzy (tputzy@brotschulpotts.com)
BROTSCHUL POTTS LLC
30 N. LaSalle Street, Suite 1402
Chicago, Illinois 60602
T:  (312) 551-9003
F:  (312) 277-3728

Michael S. Taaffe, Esq.
Justin P. Senior, Esq.
Shumaker, Loop & Kendrick, LLP
240 S. Pineapple Ave., Tenth Floor
Sarasota, FL 34236
Telephone: 941-364-2717
Facsimile: 941-366-3999
Email: mtaaffe@shumaker.com
Email: jsenior@shumaker.com
*Admission Pro Hac Vice Pending*

*Attorneys for Plaintiff Busey Bank*