**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BUSEY BANK, an Illinois Banking Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 21 C 2900 |
| MICHAEL G. TURNEY, DAVID BESLER, MILISSA OMMEN-WELBORN, RANDALL CLARK, BARBARA WEIDNER, KIRK TJERNAGEL, RON BRISCOE, SANDRA VICK, KEITH FRANK MOUIS, JOSEPH RILEY MONGIOVI, NICHOLAS W. VILLAREAL, BRADLEY DAVID GISH, KERI KIKTA, JEFFREY HOPPER, DEBORAH STOCH, and FLAGSTAR BANK, FSB, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Sara L. Ellis |
| Defendants. | ) ) | |

**OPINION AND ORDER**

Plaintiff Busey Bank ("Busey") filed this lawsuit against fifteen of its former employees (collectively, the "Former Employee Defendants") and their new employer, Flagstar Bank, FSB ("Flagstar"). The Former Employee Defendants, all involved in the mortgage loan business, left Busey for Flagstar between July and October 2020. Busey alleges that Flagstar raided its employees and that Flagstar, in conjunction with the Former Employee Defendants, is misusing Busey's proprietary and trade secret information. Busey brings claims against all Defendants for unfair competition; misappropriation of trade secrets in violation of the Illinois Trade Secrets Act ("ITSA"), 765 Ill. Comp. Stat. 1065/1 *et seq.*, and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b); tortious interference with Busey's business relationships; and civil conspiracy. It also alleges that the Former Employee Defendants breached their fiduciary duties and

contracts.  Busey alleges that Former Employee Defendant Turney, a manager, acted as a faithless servant so as to forfeit his right to compensation.  Busey claims that Flagstar induced the Former Employee Defendants to breach their fiduciary duties.  Finally, Busey alleges that Turney and Flagstar tortiously interfered with the Bank's employee contracts.  Defendants, in three separate groups, filed motions to dismiss Busey's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Because Busey has not sufficiently alleged its DTSA claim, Busey has not pleaded a sufficient basis for this Court's subject matter jurisdiction.  The Court therefore dismisses Busey's DTSA claim with prejudice and its remaining claims without prejudice.

## BACKGROUND[1]

Busey, a bank based in Illinois, provides banking and mortgage loan origination and refinancing services, among other services.  Busey generates, maintains, and protects confidential information, including market studies and strategies, financial studies, sales programs and pricing strategies, mathematical models, computer programs, statistical methods and algorithms, and personal customer information.  Busey spends substantial time, effort, and resources in developing its customer base, network, and confidential and proprietary technology and information.  Busey requires its employees to sign confidentiality and non-solicitation agreements.  The Former Employee Defendants became privy to Busey's proprietary and confidential information and had direct contact with Busey's customers, carriers, vendors, suppliers, other employees, and independent contractors.

In 2020, twenty-one Busey employees, spread across six offices in Indiana and Illinois, left Busey for Flagstar, a Michigan bank with offices in Illinois, Indiana, Michigan, Ohio, and

---

[1] The Court takes the facts in the background section from Busey's amended complaint and exhibits attached thereto and presumes them to be true for the purpose of resolving Defendants' motions to dismiss.  *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

2

Wisconsin. These include the Former Employee Defendants, who all worked for Busey in

Illinois, as well as Christa A. Smith, Casey Joanne-Elaine Wilson, Kimberly Ann Sannella, Kyle

R. Bernfield, Mark Thomas Dietrich, and Kellie Maria LaMonaca (the "Related Individuals"),

who worked for Busey in Indiana.[2] Following the resignations, Busey's North Veterans

Bloomington office, Yorkville mortgage office, Downtown Naperville office, Plainfield office,

and Homer Glen office, as well as the Carmel, Indiana mortgage suite, had no remaining

employees. Busey incurred additional costs to recruit, hire, and train new employees to restaff

these offices. Flagstar had no mortgage presence in Illinois until the Former Employee

Defendants joined it.

### A. Resignation of Busey Employees

Turney, who was a senior vice president in Busey's mortgage sales division, worked for

Busey from November 9, 2016, to August 25, 2020. Turney had access to Busey's client

records. Turney had direct supervision over many of the other Former Employee Defendants

and Related Individuals. Prior to Turney's resignation on August 25, 2020, Hopper, Sannella,

Villareal, Weidner, and Wilson left Busey to join Flagstar. After Turney's resignation, fifteen

other Busey Mortgage Sales division employees resigned to join Flagstar (Bernfield, Besler,

Briscoe, Clark, Dietrich, Gish, Kikta, LaMonaca, Mongiovi, Mouis, Ommen-Welborn, Smith,

Stoch, Tjernagel, and Vick).

Beginning in June 2020, while still working for Busey, Turney worked with Flagstar to

recruit the other Former Employee Defendants and Related Individuals to Flagstar. Specifically,

Turney requested recruitment materials from a Flagstar representative and then, with that

representative, held a WebEx conference in June 2020 during business hours with other Busey

---

[2] Busey filed a parallel suit against the Related Individuals and Flagstar in the Southern District of
Indiana. *Busey Bank v. Flagstar Bank, FSB*, No. 21 C 1526 (S.D. Ind.).

employees, soliciting them to join Flagstar and eventually work under Turney. On June 13, Turney forwarded to several Busey employees information on Flagstar products. On June 16, LaMonaca (a Related Individual) forwarded information about Flagstar, including benefits, to Tjernagel. Turney organized another WebEx meeting on June 23, 2020, with Flagstar employees and other Busey employees. Those copied on the invitation included Gish, Mouis, Villareal, Mongiovi, and Tjernagel. Turney also began setting up information calls with other Busey employees in the Bloomington office in July 2020, after which some of the Former Employee Defendants and Related Individuals began resigning. To convince other Busey employees to leave for Flagstar, Turney misrepresented facts about Busey's intention to continue in the mortgage business, stating that Busey was leaving the mortgage business and that it would not need as many mortgage lenders in the near future. A day after Busey approached Turney concerning reports that he had been soliciting employees to leave Busey for Flagstar, Turney resigned on August 25, 2020, with many of the other Former Employee Defendants following suit shortly thereafter. Turney took on the role of Area Manager at Flagstar and has continued to manage many of the other Former Employee Defendants and Related Individuals there.

The other Former Employee Defendants worked at Busey as follows:

- Besler: August 1, 2005, to October 23, 2020;

- Ommen-Welborn: January 2, 2019, to October 23, 2020;

- Clark: January 11, 1999, to October 23, 2020;

- Weidner: August 19, 2019, to July 24, 2020;

- Tjernagel: February 15, 2017, to August 28, 2020;

- Briscoe: January 12, 2009, to October 23, 2020;

- Vick: December 18, 2017, to October 23, 2020;

- Mouis: November 5, 2016, to September 4, 2020;

- Mongiovi: November 5, 2016, to August 28, 2020;

- Villareal: November 5, 2016, to July 24, 2020;

- Gish: August 19, 2019, to September 1, 2020;

- Kikta: November 9, 2015, to August 29, 2020;

- Hopper: July 22, 2019, to August 22, 2020;

- Stoch: August 3, 2015, to August 29, 2020.

All of the Former Employee Defendants and Related Individuals left Busey to join Flagstar. Flagstar employs each of the Former Employee Defendants in Illinois, with the exception of Weidner, who Busey believes is no longer with Flagstar.

Turney, the Former Employee Defendants, the Related Individuals, and Flagstar have contacted and attempted to recruit Busey employees, using confidential information Turney and others took with them when leaving Busey.  For example, on September 24. 2020, Goetz texted three Busey employees about Flagstar employment opportunities, following up with one employee the day after five other Busey employees resigned to join Flagstar.

At Flagstar, the Former Employee Defendants and Related Individuals had access to Busey's client records and information.  Busey paid Turney and provided him opportunities to develop, cultivate, and maintain client relationships.  Many of these clients moved to Flagstar. Busey competitors would find Busey client identities and information valuable as identifying clients who generate significant revenues, particularly in the current environment where roughly half of Busey's business comes from existing clients refinancing loans due to historically low rates.  Busey takes actions to preserve the confidentiality of its employee and client information.

Turney, the Former Employee Defendants, the Related Individuals, and Flagstar have contacted and solicited Busey customers, using confidential information Turney and others took with them when leaving Busey. For example, on July 24, 2020, the day that Sannella, Villareal, and Weidner resigned, Related Individual LaMonaca emailed Gish's client list, containing confidential information on over 50 Busey customers (including their contact information, loan details, interest rates, and credit scores) to Weidner, who was Gish's assistant. On August 25, 2020, several days before his resignation, Tjernagel emailed himself documents including closing lists, purchase matrices, and closed loan commissions. These documents included information regarding loans, customer names, closing dates, interest rates, and payment status, among other information. A number of the Busey customers listed in these documents have since had loans serviced at Flagstar. The day before his resignation, Related Individual Dietrich emailed himself documents including a client list and database spreadsheet with customer information. In the month before their resignations, Ommen-Welborn and Besler emailed themselves similar documents including customer loan information, and Ommen-Welborn also emailed herself a PowerPoint presentation concerning Busey's mortgage loan programs. One of the Related Individuals took physical records from Busey.

Flagstar and the Former Employee Defendants, including Tjernagel, Briscoe, and Mouis, also continued to solicit Busey employees, using personal contact information for these employees that Turney and others provided to Flagstar.

As of the filing of the amended complaint in February 2022, the Former Employee Defendants and Related Individuals had solicited and transferred over 750 loan payoffs, totaling over $100 million, from Busey to Flagstar. Additionally, at the time the Former Employee

Defendants left Busey, they had a number of loans in the pipeline, which ultimately were moved over to Flagstar.

###### B. Participation Agreements

Some, but not all, of the Former Employee Defendants and Related Individuals had signed participation agreements with Busey that included both confidentiality and non-solicitation provisions. The Former Employee Defendants with agreements are: Besler, Briscoe, Clark, Gish, Mongiovi, Mouis, Ommen-Welborn, Tjernagel, and Vick.

The participation agreements provided the following with respect to confidentiality:

> Participant acknowledges that the nature of Participant's employment requires that Participant produce and have access to records, data, trade secrets and information that are not available to the public ("Confidential Information") regarding First Busey Corporation and its subsidiaries and affiliates (collectively, "Busey"). Participant shall hold in confidence and not directly or indirectly disclose any Confidential Information to third parties unless disclosure becomes reasonably necessary in connection with Participant's performance of Participant's duties, or the Confidential Information lawfully becomes available to the public from other sources, or Participant is authorized in writing by Busey to disclose it or Participant is required to make disclosure by a law or pursuant to the authority of any administrative agency or judicial body. . . . All Confidential Information and all other records, files, documents and other materials or copies thereof relating to the business of Busey that Participant prepares or uses shall be the sole property of Busey.

Doc. 81-1 at 11. The agreements also included a provision limiting the use of Busey computer systems and networks to "legitimate business purposes on behalf of Busey," providing that "any other access to or use of such systems, network and equipment is without authorization and is prohibited." *Id.* Per the agreement, employees could not "transfer any Busey information to any personal computer or other electronic device that is not otherwise used for any business purpose relating to Busey" and were to "promptly return all originals and copies of any Confidential

Information and other records, files, documents and other materials to Busey" upon the termination of their employment. *Id.*

The agreements also included a non-solicitation covenant:

> As an essential ingredient and in consideration of Participant's participation in the Plan, Participant shall not, for a period of twelve (12) months after termination of Participant's employment with Busey for any reason (the "Restrictive Period"), directly or indirectly do any of the following (the "Restrictive Covenant"):

> (a) for himself or herself or any person, firm, partnership, corporation, trust or other entity that owns or operates, a bank, savings and loan association, credit union, wealth management or investment advisory firm or similar financial institution (a "Financial Institution"): (i) induce or attempt to induce any officer of Busey, or any employee who previously reported to Participant, to leave the employ of Busey; (ii) in any way interfere with the relationship between Busey and any such officer or employee; (iii) employ, or otherwise engage as an employee, independent contractor or otherwise, any such officer or employee; or (iv) induce or attempt to induce any customer, supplier, licensee or business relation of Busey to cease doing business with Busey or in any way interfere with the relationship between Busey and any of its customers, suppliers, licensees or business relations, where Participant had personal contact with, or has accessed Confidential Information in the preceding twelve (12) months with respect to, such customers, suppliers, licensees, or business relations; or

> (b) for himself or herself or any Financial Institution, solicit the business of any person or entity known to Participant to be a customer of Busey, where Participant, or any person reporting to Participant, had personal contact with such person or entity, with respect to products, activities or services that compete in whole or in part with the products, activities or services of Busey.

*Id.* at 12. Finally, the participants agreed not to "make any disparaging remarks about Busey or in any way demean the reputation of Busey or its employees, products or services" after the termination of the participant's employment. *Id.*

Villareal had an agreement with Pulaski Bank (which merged into Busey and Busey acquired its assets, including contracts), which he entered in November 2015, which also

8

included non-solicitation and confidentiality provisions. The non-solicitation provision

provided:

> For a period of one (1) year following termination of Loan Officer's employment from the Bank, for any reason, Loan Officer shall not, directly or indirectly, as an employee, agent, consultant, shareholder, member, officer, director, partner or in any other individual or representative capacity: (1) solicit, call upon, divert, encourage or accept business from any borrower or customer (or prospective borrower or customer) of the Bank, (ii) perform services for any borrower or customer (or prospective borrower or customer) of the Bank, or (iii) solicit for employment or hire any person employed by the Bank at the time of Loan Officer's termination, or who was employed by the Bank within one (1) year immediately preceding said termination. For purposes of this Agreement, any person or entity which is a borrower or customer of the Bank on the date of Loan Officer's termination of employment from the Bank, or which has been a borrower or customer of the Bank during the one (1) year preceding the date of said termination, shall be deemed to be a borrower or customer of the Bank.

Doc. 81-10 at 3. The confidentiality provision prohibits the disclosure, communication, use to

the Bank's detriment, or misuse of proprietary or confidential information or trade secrets,

including:

> the Bank's trade secrets or other intellectual property rights, personnel information, technical information and data, marketing information and techniques, know-how, customer names or data, borrower names or data, referral sources or names, financial statements and budgets, sources of funds, credit products and services, prices, fees, costs, plans, suppliers, vendors or other confidential or proprietary data of any nature.

*Id.* Villareal agreed to return all confidential information and other bank property to the Bank at

the time of the termination of his employment, as well as not to make any disparaging remarks

about the Bank or that would demean the Bank, its employees, products, and services.

### C.      Busey Policies

Busey also has several policies that address the use of its systems and information.  The Electronic Resources Acceptable Use Policy provides that Busey employees may not "[r]eveal or publicize confidential or proprietary information which includes, but is not limited to: financial information, confidential client information, marketing strategies and plans, databases and any information contained therein, client lists, computer software source codes, computer/network access codes, and business relationships."  Doc. 81-11 ¶ 13.  Busey's Information Security Policy provides that authorized users may only use their privileged access for "appropriate, legitimate, business required functions of Busey" and act in a way that "maintains the confidentiality, integrity, and availability for all Busey information."  *Id.* ¶ 14.  That policy defines confidential information as including customers' "name and address, social security number/tax identification number, credit scores or history, account balance, account number, account status, common information gathered for identification purposes (i.e. driver's license number, mother's maiden name, birth date)."  *Id.*

### D.      Code of Ethics

Busey also has a Code of Ethics, signed by all employees annually.  Regarding confidentiality, the Code of Ethics provides:

> Employees, officers and directors must maintain the confidentiality of confidential information entrusted to them by the Company or its suppliers or customers, except when disclosure is authorized by the Board of Directors or required by laws, regulations, or legal proceedings. . . . Confidential information includes all non-public information that might be of use to competitors of the Company, or harmful to the Company or its customers if disclosed.

Doc. 81-12 at 2.  The Code requires the protection and proper use of Busey assets, including their use "for legitimate business purposes."  *Id.*  The Code also discusses the "maintenance of

10

books and records," which "should always be retained or destroyed according to the Company's record retention policies." *Id.*

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

On January 10, 2022, this Court dismissed the initial complaint, without prejudice, because Busey failed to adequately allege a DTSA claim, and therefore this Court lacked subject matter jurisdiction. Doc. 80. In its amended complaint, Busey brings only one federal claim, for violation of the DTSA, as well as a number of state law claims. Because Busey and the Former Employee Defendants are all Illinois citizens, Busey cannot rely on diversity jurisdiction as the basis for subject matter jurisdiction and instead contends that the Court has original jurisdiction over the federal claim and supplemental jurisdiction over the state law claims. Therefore, before

addressing any other arguments for dismissal, the Court again considers whether Busey has adequately alleged a DTSA claim.

## I.   DTSA Claim (Count IV)

The DTSA, 18 U.S.C. § 1836, creates a private cause of action for "an owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Because the DTSA, enacted in 2016, closely tracks the ITSA, the Court looks to the ITSA for guidance. *See Aon Risk Servs. Cos. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843, 847–48 (N.D. Ill. 2019); *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16 C 03545, 2017 WL 1954531, at *3 (N.D. Ill. May 11, 2017). To state an ITSA violation, Busey must allege that information was (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business. *UTStarcom, Inc. v. Starent Networks, Corp.*, 675 F. Supp. 2d 854, 864 (N.D. Ill. 2009).

### A.   Existence of a Trade Secret

The parties do not dispute that Busey adequately alleged the existence of a trade secret. The DTSA defines a trade secret as business-related information that the owner of which has taken reasonable measures to keep secret and from which the owner derives economic value from the information not being generally known or readily ascertainable by others who could gain an economic advantage from the information. 18 U.S.C. § 1839(3). The ITSA similarly defines a trade secret as:

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or supplies, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are

12

reasonable under the circumstances to maintain its secrecy or confidentiality.

765 Ill. Comp. Stat. 1065/2(d).

For a DTSA or ITSA claim to survive a motion to dismiss, a complaint need only identify the alleged trade secret in a general sense. *See, e.g.*, *Wells Lamont Indus. Grp. LLC v. Richard Mendoza & Radians, Inc.*, No. 17 C 1136, 2017 WL 3235682, at *3 (N.D. Ill. July 31, 2017) (allegation that the defendant "was exposed to confidential information such as customer account information, product summaries, pricing sheets, product prototypes, product designs, and detailed sales reports" sufficed at the pleading stage). To determine whether a trade secret exists, Illinois courts generally look to:

> (1) the extent that the information is known outside of the business; (2) the extent that the information is known to employees and others within the business; (3) the measures taken to protect the information from outsiders; (4) the value of the information to competitors; (5) the amount of time, money, and effort to develop the information; and (6) the ease that the information could be acquired by others.

*UTStarcom, Inc.*, 675 F. Supp. 2d at 865 (citing *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003)). "Where an employer has invested substantial time, money, and effort to obtain a secret advantage, the secret should be protected from an employee who obtains it through improper means." *Von Holdt v. A-1 Tool Corp.*, No. 04 C 04123, 2013 WL 53986, at *11 (N.D. Ill. Jan. 3, 2013). Ultimately, a plaintiff "must prove that the real value of the information lies in the fact that it is not generally known to others who could benefit from using it." *Id.*

As the Court found in its prior opinion and order, Busey's allegations that the customer lists that the Former Employee Defendants allegedly took with them to Flagstar included detailed information not generally available to the public and which Busey claims took considerable time

13

and effort to compile, which suggests the existence of a trade secret. *See Fleetwood Packaging v. Hein*, No. 14 C 09670, 2015 WL 6164957, at *3 (N.D. Ill. Oct. 20, 2015) (customer lists "can warrant protection as trade secrets" but the lists must be "sufficiently secret" and must have taken "considerable effort, time, and resources" to build); *Strata Mktg., Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1069 (2000) ("Strata's customer lists, which it alleged take considerable effort, time, and money to compile, could be deemed a trade secret and sufficiently secret to derive economic value."). Information about other Busey employees' contact information may have been readily available and thus does not merit trade secret protection. *Chicagoland Aviation, LLC v. Todd*, No. 12 C 1139, 2012 WL 5948960, at *5 (N.D. Ill. June 8, 2012) (information does not warrant protection if it is "generally available to employees, known by persons in the trade, or easily found in telephone directories and industry directories").

### B. Misappropriation

Defendants argue that Busey has again failed to adequately alleged misappropriation. Misappropriation under the DTSA includes the "acquisition of a trade secret of another . . . by improper means" and "disclosure or use of a trade secret of another without express or implied consent" under certain conditions. 18 U.S.C. § 1839(5). Similarly, under the ITSA, a plaintiff can show "misappropriation" in one of three ways: "improper acquisition, unauthorized disclosure, or unauthorized use." *Traffic Tech, Inc. v. Kreiter*, No. 14-cv-7528, 2015 WL 9259544, at *12 (N.D. Ill. Dec. 18, 2015) (citing 765 Ill. Comp. Stat. 1065/2(b) and collecting cases).

Busey alleges that Defendants misappropriated its trade secrets by unauthorized disclosure and use, which "requires a defendant to use the alleged trade secrets or disclose them to others 'for purposes other than serving the interests of' the owner of the trade secrets." *Id.*

(quoting *Instant Tech, LLC v. DeFazio*, 40 F. Supp. 3d 989, 1015–16 (N.D. Ill. 2014)).

Defendants argue, however, that Busey does not identify any specific unauthorized disclosure or

use of trade secrets by any individual Former Employee Defendant and cannot simply speculate

that the Former Employee Defendants must have used its trade secrets to compete.  "A complaint

may make allegations upon information and belief where the facts are inaccessible to the

plaintiff, but it must also plead reasonable grounds for its suspicions."  *Indus. Packaging

Supplies, Inc. v. Channell*, No. 18 C 165, 2018 WL 2560993, at *2 (N.D. Ill. June 4, 2018).

Busey argues that it may plead misappropriation on information and belief because Defendants

are uniquely in possession of the facts concerning the alleged misappropriation.  Defendants, on

the other hand, argue that Busey has had sufficient time to determine whether the Former

Employee Defendants took and used any trade secrets.

      Here, Busey has attached to its complaint printouts of emails that Tjernagel sent to

himself at his work emails, Weidner received at her work email, Ommen-Welborn sent to a

personal email address, and Besler sent to himself,[3] all of which include customer lists as

attachments.[4]  The complaint and exhibits do not otherwise suggest that any of the other Former

Employee Defendants took any Busey documents with them upon leaving Busey.  Given

Busey's investigation and discovery of the Besler, Ommen-Welborn, Tjernagel, and Weidner

emails, the Court does not find plausible Busey's unsupported suspicion that any of the other

Former Employee Defendants took Busey's customer lists when they left Busey.  Busey now

adds the allegation that one of the Related Individuals took physical documents upon his or her

---

[3] The Court cannot determine from the exhibit attached to the complaint whether Besler sent the email to himself at his work or personal email address.

[4] The amended complaint also includes, as an exhibit, emails that Dietrich, one of the Related Individuals, sent to his personal email address, but because Dietrich is not a defendant in this case, the Court does not discuss him further.

resignation, and that it is therefore reasonable to infer that the Former Employee Defendants also took physical documents at Turney and Flagstar's direction or with their encouragement. However, the amended complaint does not provide any support for this undifferentiated allegation (against different individuals who worked in another office in a different state), much less enough to provide a reasonable suspicion that any one particular defendant in this case committed this kind of misappropriation. *Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*, No. 17 C 923, 2018 WL 1156246, at *3 (N.D. Ill. Mar. 5, 2018) (rejecting group pleading and bare conclusions, explaining: "liability is personal and must put each defendant on notice of their actions").

But, as the Court found in its prior dismissal opinion, even assuming that all of the Former Employee Defendants took Busey's customer lists with them (whether in hard copy or electronic format), "mere possession of trade secrets does not suffice to plausibly allege disclosure or use of those trade secrets, even when considered in conjunction with solicitations of former clients." *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020); *see also Channell*, 2018 WL 2560993, at *2 ("Industrial Packaging has alleged that Channell and other Axis employees used to work at Industrial Packaging, where they had access to its trade secrets and that Axis offers the same services and targets the same clients as Industrial Packaging. But this is not enough to justify its otherwise unsupported suspicions that the defendants used or disclosed the information they had access to while working for Industrial Packaging."). Nor do Busey's allegations that it has lost business to Flagstar further its claim that Defendants have misappropriated Busey's trade secrets. *See Croner*, 419 F. Supp. 3d at 1069 ("[L]ost business alone is not enough to support a claim of trade secret misappropriation,

and PCA must adequately allege that Croner has done more than legally compete in the normal course of business.").  Without more, Busey again has not plausibly alleged its DTSA claim.

Busey asserts that it can proceed under the "inevitable disclosure" doctrine, where "a plaintiff may prove trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets."[5]  *Mickey's Linen v. Fischer*, 2017 WL 3970593, at *12 (N.D. Ill. Sept. 8, 2017) (citation omitted).  "In order to trigger the inevitable disclosure doctrine, a plaintiff must show more than the possibility that defendants *could* misuse the plaintiff's trade secrets; it must show that the defendants *will* misuse those secrets."  *Fleetwood Packaging*, 2014 WL 7146439, at *7.  "The factors to determine whether disclosure of trade secrets is inevitable are: 1) the level of competition between the former employer and the new employer; 2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and 3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer."  *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001).  Busey argues that disclosure of its customer data is inevitable because: (1) Flagstar is now (as it was not before the corporate raid) a direct competitor with Busey in the Illinois mortgage services sector; (2) the Former Employee Defendants took on identical roles, especially Turney who is managing the same individuals as at Busey; and (3) Flagstar took no actions, and indeed encouraged, the Former Employee Defendants to use Busey confidential information, as shown by the large number of loans transferred from Busey to Flagstar over a short period of time.

Defendants do not dispute Busey's argument that Flagstar is now a direct competitor, and they do not seriously engage its allegations of encouragement.  As for similar employee roles,

---

[5] Defendants argue that courts recognize this doctrine only in the context of a plaintiff seeking injunctive relief for threatened trade secret misappropriation.  This Court notes that the parties' cases are in that procedural posture but sees nothing to directly preclude Busey from relying on the theory here.

the amended complaint does not give any specifics as to the former or new positions of any of

the Former Employee Defendants except Turney, who is alleged to hold another managerial

position overseeing the same individuals as at Busey.  This lack of detail on the non-Turney

Defendants cannot support the inference that he or she would inevitably use Busey's confidential

customer data in his or her new role.  *See Opus Fund Servs.*, 2018 WL 1156246, at *4 (court

could not infer use of trade secrets from allegations that defendants moved to competitor);

*PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) (finding inevitable disclosure by

executive moving from one niche strategy role to another, contrasting the case with ones where

"plaintiffs could do nothing more than assert that skilled employees were taking their skills

elsewhere").

As for Turney, "the mere fact that a person assumed a similar position at a competitor

does not, without more, make it 'inevitable that he will use or disclose . . . trade secret

information[.]'" *PepsiCo*, 54 F.3d at 1269 (citation omitted).  Busey must plead "a showing of

intent or a high probability that the employee will use trade secrets." *Croner*, 419 F. Supp. 3d at

1070 (citation omitted) (internal quotation marks omitted).  Busey fails to do so.  As discussed

above, the amended complaint contains only general allegations that Turney took customer data

(unlike Besler, Ommen-Welborn, Tjernagel, and Weidner).  And even if Turney took

confidential information, Busey does not explain why supervising the same individuals means

Turney would be highly likely to use it, and the amended complaint does not even allege that

Turney solicited loans in his new role.[6]  *See Channell*, 2018 WL 2560993, at *3 ("Channell

could avoid using Industrial Packaging's trade secrets by simply not targeting Industrial

Packaging clients and not using its proprietary designs, products, or processes.").  The transfer of

---

[6] Turney did not sign a participation agreement containing a non-solicitation clause (unlike several other of the Former Employee Defendants).

loans, without any allegations to link Turney (or the confidential information) to that transfer does not, without more, show that Turney "could not operate or function" in his new role without the client data. *Croner*, 419 F. Supp. 3d at 1070 (citation omitted) (collecting cases). The amended complaint does not demonstrate that Turney "cannot avoid taking into account the confidential information carried with him from [Busey] in performing his new role." *Fleetwood Packaging*, 2014 WL 7146439, at *7; *see also Teradyne, Inc. v. Clear Commc'ns Corp.*, 707 F. Supp. 353, 357 (N.D. Ill. 1989) ("The defendants' claimed acts, working for Teradyne, knowing its business, leaving its business, hiring employees from Teradyne and entering the same field (though in a market not yet serviced by Teradyne) do not state a claim of threatened misappropriation. All that is alleged, at bottom, is that defendants could misuse plaintiff's secrets, and plaintiffs fear they will. This is not enough."). "Courts are cautious in their application of the [inevitable disclosure] doctrine due to its significant potential to curb employee movement among competitors." *Croner*, 419 F. Supp. 3d at 1070 (citation omitted) (internal quotation marks omitted). The Court will not extend the doctrine here.

Because Busey has been afforded the opportunity to amend its complaint to address the deficiencies in its DTSA claim and has failed to do so, the Court dismisses Busey's DTSA claim with prejudice.

## II. Supplemental State Law Claims

Busey also again brings numerous state law claims against Defendants, which it contends that the Court has supplemental jurisdiction over pursuant to 28 U.S.C. § 1367. But because the Court dismisses the DTSA claim over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Busey's state law claims. *See* 28 U.S.C. § 1367(c); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of

this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").  The Court therefore dismisses the state law claims against Defendants without prejudice.  Busey can attempt to pursue these claims in state court.

## CONCLUSION

For the foregoing reasons, the Court grants in part Defendants' motions to dismiss [89, 91, 93].  The Court dismisses the DTSA claim with prejudice and the state law claims without prejudice.  Civil case terminated.

Dated: September 6, 2022

SARA L. ELLIS
United States District Judge